## UNITED STATES v. JOHNSON.

District Court, D. Nevada. October 19, 1929.

### No. 7105.

H. H. Atkinson, U. S. Atty., and Geo. A. Whiteley, Asst. U. S. Atty., both of Reno, Nev., and Geo. A. Montrose, Asst. U. S. Atty., of Gardnerville, Nev.

William M. Kearney, of Reno, Nev., for defendant.

NORCROSS, District Judge. ■ Defendant's demurrer presents the question whether a certain regulation of the Secretary of Agriculture, alleged to have been violated, was within powers conferred by Congress.

The information charges that the defendant on September 23, 1925, "unlawfully did knowingly drive a number of cattle, to wit, thirteen cows, on foot from Eldorado County, in the State of California, into Douglas County in the State and District of Nevada, * * * without the said cattle having been subjected to a tuberculin test * * * contrary to the form of the statute," etc.

The information further recites that "on February 25, 1925, the Secretary of Agriculture, pursuant to the provisions of the Act of Congress approved February 2, 1903 (32 Stat. 791 [21 USCA §§ 111, 120–122]), did make and duly promulgate a certain regulation, to wit, Regulation 7, * * * which said regulation is contained in B. A. I. Order No. 292 of the Bureau of Animal Industry of the United States Department of Agriculture, * * * the text of which said regulation * * * in substance provides," etc.

The precise language of so much of paragraph 1 of section 1 of said Regulation 7 as is deemed essential for a determination of the question presented upon the demurrer reads: "No cattle shall be shipped, driven on foot, transported, or received for transportation interstate unless and until such cattle have been subjected to a physical examination and tuberculin test, applied as directed in paragraph 2 of this section, and a tuberculin-test chart and health certificate, showing them to be apparently free from tuberculosis and any other contagious, infectious, or communicable disease of animals, has been issued."

The authority, if any exists, for the making and promulgation of said Regulation 7 is to be found in that certain act of Congress, approved February 2, 1903, entitled "An Act to enable the Secretary of Agriculture to more effectually suppress and prevent the spread of contagious and infectious diseases of live stock, and for other purposes," the material portion of which reads:

"That in order to enable the Secretary of Agriculture to effectually suppress and extirpate * * * contagious, infectious, and communicable diseases in cattle, * * * and to prevent the spread of such diseases, the powers conferred * * * by sections four and five of an Act entitled 'An Act for the establishment of a Bureau of Animal Industry, * * * approved May twenty-ninth, eighteen hundred and eighty four, * * * are hereby conferred on the Secretary of Agriculture, to be exercised exclusively by him. He is hereby authorized and directed, from time to time, to establish such rules and regulations concerning the exportation and transportation of live stock from any place within the United States where he may have reason to believe such diseases may exist into and through any State or Territory, * * * as he may deem necessary, and all such rules and regulations shall have the force of law. Whenever any inspector * * * shall issue a certificate showing that such officer had inspected any cattle or other live stock which were about to be shipped, driven, or transported from such locality to another, as above stated, and had found them free from * * * disease, such animals, so inspected and certified, may be shipped, driven, or transported from such place into and through any State or Territory. * * *

"Sec. 2. That the Secretary of Agriculture shall have authority to make such regulations and take such measures as he may deem proper to prevent the introduction or dissemination of the contagion of any contagious, infectious, or communicable disease of animals * * * from one State or Territory of the United States * * * to another, and to seize, quarantine, and dispose of any hay, straw, forage, or similar

material, or any meats, hides, or other animal products coming from an infected foreign country to the United States, or from one State * * * in transit to another State * * * whenever in his judgment such action is advisable in order to guard against the introduction or spread of such contagion.

"Sec. 3. That any person, company, or corporation knowingly violating the provisions of this Act or the orders or regulations made in pursuance thereof shall be guilty of a misdemeanor. * * *" (21 USCA §§ 111, 120–122.)

It is quite clear from the provisions of section 1 that Congress intended to invest the Secretary of Agriculture with power to make rules and regulations concerning transportation of live stock from "any place within the United States where he may have reason to believe such diseases may exist," but it is also quite clear that the rules and regulations authorized by this section were not intended to be of general application.

By the Act of February 2, 1903, the powers of the Secretary of Agriculture respecting the establishment of quarantine areas were not well defined. It would appear from section 1 of the act (21 USCA §§ 120, 121) that he might in effect establish a quarantine, although that word is not expressly used in the section. The word "quarantine" is expressly used in section 2 of the act (21 USCA § 111), but it would there appear to be limited to animal foods or products "coming from an infected foreign country * * * or from one State * * * in transit to another." As the word "infected" is used in the section, we think it should be construed to apply to the word "State" as well as the words "foreign country."

The Act of May 29, 1884 (23 Stat. 31), "For the establishment of a Bureau of Animal Industry," etc., made provisions for the expenditure of certain moneys for "quarantine measures" and other purposes having to do with the extinction of communicable diseases among domestic animals; but the language of the statute would appear to limit such expenditures to such states where the state authorities "signify their readiness to cooperate." Section 3 (21 USCA § 114).

It was not until the Act of Congress of March 3, 1905 (33 Stat. 1264), "An Act to enable the Secretary of Agriculture to establish and maintain quarantine districts, to permit and regulate the movement of cattle and other live stock therefrom, and for other purposes," that the Secretary of Agriculture was given specific power "to quarantine any State, * * * or any portion of any State * * * when he shall determine the fact that cattle or other live stock in such State * * * are affected with any contagious, infectious, or communicable disease." Section 1 (21 USCA § 123).

By section 2 of the last-mentioned act (21 USCA § 124) it is, among other things, provided: "Nor shall any person * * * drive on foot, or cause to be driven on foot, or transport in private conveyance * * * from a quarantined State * * * into any other State * * * any cattle or other live stock, except as hereinafter provided." A violation of the provisions of the section was made a misdemeanor.

By the provisions of section 6 of the Act of May 29, 1884 (21 USCA § 115), creating the Bureau of Animal Industry, it was made unlawful for any person to "drive on foot or transport in private conveyance from one State or Territory to another * * * any live stock, knowing them to be affected with any contagious, infectious, or communicable disease." U. S. v. Slater (D. C.) 123 F. 115.

A reading of the several acts of Congress referred to discloses that Congress has specifically made the driving of cattle on foot from one state to another an offense in the case of either of two contingencies—where they are so driven "knowing them to be affected," or where they are so driven without permit from a "quarantined State" or from "the quarantined portion of any State."

Congress, having control of interstate commerce, doubtless has power to prescribe by statute that cattle or other domestic animals may not be transported or driven on foot from one state to another without prior inspection, and the issuance of a certificate that they are free from disease. Buttfield v. Stranahan, 192 U. S. 470, 494, 24 S. Ct. 349, 48 L. Ed. 525. Congress, however, by specific enactment did not make such a general provision. The effect of Regulation 7 is to make it an offense to drive any cattle, other than in the case of certain specified exceptions, from one state to another without a certificate "showing them to be apparently free from tuberculosis and any other * * * communicable disease," regardless of whether a quarantine has been established or that they are from a "locality" where the Secretary of Agriculture "may have reason to believe such disease may exist."

In the brief filed upon the part of the government it is not contended that the expression in section 1 of the Act of February 2, 1903 (21 USCA §§ 120, 121), "to estab-

lish such rules and regulations concerning * * * transportation of live stock from any place * * * where he may have reason to believe such diseases may exist," confers on the Secretary of Agriculture authority to establish the regulation in question, but it is contended the authority is to be found in section 2 of the act (21 USCA § 111), "to make such regulations . * * * as he may deem proper to prevent the introduction or dissemination of the contagion of any contagious, infectious, or communicable disease of animals * * * from one State * * * to another."

Broad as is the language of this section, it will hardly be contended, we think, that it is not to be construed in connection with other provisions of the act. By section 1 of the act there is also conferred on the Secretary of Agriculture the powers formerly conferred on the Secretary of the Treasury by the act of 1884 creating the Bureau of Animal Industry. This prior act not only contemplated state co-operation, but "quarantine measures as may be necessary to prevent the spread of the disease from one State or Territory into another." Act May 29, 1884, § 3 (21 USCA § 114).

It would appear both from the acts of 1903 and of 1884 that Congress had in contemplation that before commerce between the states could be affected, either a quarantine should be declared, or the "place" or "locality" from which interstate transportation of live stock was to be controlled should be one where the Secretary of Agriculture had "reason to believe such diseases may exist."

This view of the two preceding statutes we think is confirmed by the Act of March 3, 1905, which for the first time clearly conferred on the Department of Agriculture power to quarantine any state or any portion thereof. This act makes specific provision for the publication of notice of the establishment of such quarantine. If section 2 of the act of 1903 conferred on the Secretary of Agriculture the power to make a regulation such as that in question in this case, it is not apparent that the act of 1905 added anything to the powers of the Department of Agriculture. It would appear rather to be a restriction in that section 2 of the act of 1903 does not require newspaper publication and printed or written notice to carriers in case of quarantine as does the act of 1905.

■ It is clear from the various statutes that Congress invested the Commissioner, and later the Secretary of Agriculture, with extensive powers in the eradication of disease among domestic animals, in which the matter of the control of foreign and domestic commerce, within certain prescribed limits, is but a part of the general purpose—the suppression of disease. Courts, particularly in districts where live stock interests are of great moment, will take judicial notice of the beneficent effects of such legislation. We are here, however, dealing with the question whether, as appears from the affidavit attached to the information, a person owning ranches in adjoining counties of two states drives cows across a state line from one ranch to the other without having a permit, as prescribed in said Regulation 7, commits an offense against the laws of the United States.

We are not disposed to doubt the wisdom of a regulation that would apply even in extreme cases like the one at bar, and we further appreciate that in any event courts have nothing to do with the wisdom or policy of statutes or of regulations made by a department within powers so conferred. Utah Power & Light Co. v. U. S., 243 U. S. 389, 410, 37 S. Ct. 387, 61 L. Ed. 791. We are, however, required to determine whether the power has been conferred, and in such determination we are bound to ascertain the limits which Congress has prescribed, as regulations may not exceed such limits. It will be conceded that if Congress had intended to prohibit all movement of live stock from one state to another except in accordance with regulations of the Department of Agriculture, it could have so provided and made its intention clear. We find, however, the enactment of several statutes showing a gradual development of the law and a more precise expression of certain of the powers conferred, particularly in relation to matters of quarantine. Estes v. U. S. (C. C. A.) 227 F. 818; 21 USCA §§ 102, 103.

The only express authority, however, appearing in the act of 1903 for an inspection of cattle or other live stock and the issuance of a certificate showing them to be free from disease, and entitling them "to be shipped, driven, or transported" interstate, specifically provides "from such locality to another," and "such locality" relates to the preceding expression "any place * * * where he may have reason to believe such diseases may exist." That Congress alone has power to legislate concerning interstate and foreign commerce and cannot delegate such powers is, of course, conceded. After citing the Buttfield Case, supra, and a number of other decisions of the Supreme Court of the

United States, counsel for the government say: "These decisions lay down the rule that Congress may make a law and therein delegate to an executive officer the power to determine some fact or state of things upon which the law makes, or intends to make, its own action operate." It is the very rule laid down by the decisions cited that, we think, is conclusive against the regulation in question in this case. Congress has not as yet enacted a statute broad enough in scope to permit the making of a regulation such that the driving of cattle not alleged to be affected with disease or coming from a quarantined state, or place where the Secretary of Agriculture has reason to believe such diseases may exist, would constitute an offense against the laws of the United States.

Counsel for the government in their brief further say: "Congress, in enacting section 2, legislated as far as it deemed practicable on the subject of the prevention of the dissemination of any communicable diseases of animals through their importation or interstate movement and left to the Secretary of Agriculture the duty of carrying out its indicated will." A careful reading of section 2 (now section 111, tit. 21, USCA) fails to disclose any legislation whatever upon the part of Congress respecting the movement of live stock interstate, other than the conferring upon the Secretary of Agriculture the authority to make regulations and the exercise of certain powers respecting "infected" areas, foreign or domestic. If this section alone were to be considered, then, so far as regulations are concerned, it would appear to be subject to the objection of an attempt to confer legislative powers. The section, however, as before stated, is to be construed with other provisions of the statute.

The case of U. S. v. Pennsylvania Co. (D. C.) 235 F. 961, is cited as an authority supporting the contention of counsel for the government. The court in that case was considering a regulation governing the interstate shipment of hides from a quarantined state and is, we think, clearly distinguishable on the facts. The case at bar is, we think, within the reasoning of the Attorney General holding an order of the Secretary of Agriculture "prohibiting the importation of hay and straw from continental Europe * * * is a regulation of commerce with foreign nations and an exercise of legislative power, and therefore void." 25 Ops. Attys. Gen. 249.

It is concluded, therefore, that the only power conferred by Congress for the making of regulations requiring an examination and tuberculin test before cattle may be driven interstate is in relation to localities where a quarantine has been established, or where the Secretary of Agriculture "may have reason to believe such diseases may exist."

The demurrer is sustained.