### HAWKE v. COMMISSIONER OF INTERNAL REVENUE.

#### No. 9191.

Circuit Court of Appeals, Ninth Circuit.
Feb. 26, 1940.

HANEY, Circuit Judge, dissenting in part.

———◆———

Alan W. Davidson, of Oakland, Cal. (Francis O. Hoover, of Modesto, Cal., of counsel), for petitioner.

Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, Ellis Slack, and S. Dee Hanson, Sp. Assts. to Atty. Gen., for respondent.

Before GARRECHT, HANEY, and STEPHENS, Circuit Judges.

STEPHENS, Circuit Judge.

This appeal involves income taxes for the years 1930 and 1931. The Board of Tax Appeals, upon petition of the taxpayer, redetermined deficiencies and the taxpayer has petitioned us for a review of the decision of the Board.

Taxpayer was employed by the J. C. Penney Company, a corporation, in 1913, and remained continuously in its employ until May, 1933. From 1919 until he left the employ of the Company in 1933 he was the manager of the Company's Modesto, California store. Under the corporate set up of the J. C. Penney Company, each of its stores was individually capitalized, there being a separate stock classification for each store. Taxpayer was permitted to, and did, purchase one-third of the classified common stock of said store. Under an oral contract of employment he received a salary of $75 per month, and, in addition, received one-third of the profits of the store because of his ownership of one-third of the classified stock of that store. In April, 1927, due to a change in the corporate structure of the J. C. Penney Company, taxpayer's classified common stock of said store was called in by the Company, and taxpayer received in full exchange therefor 100 shares of the preferred stock of the Company. At the same time he was reemployed by the Company as manager of the Modesto store, under a written contract of employment which became effective as of January 1, 1927. Said contract provided, among other things, that the taxpayer would continue as manager of said store and would devote his entire time and the best of his ability to the successful prosecution of his duties as such. It was agreed on the part of the Company as follows: "Commencing January 1, 1927, to pay to such Associate [taxpayer] each year as added compensation, in addition to the regular salary received by him the same fractional portion of the net earnings of said store for which said Associate is manager as he would have been entitled to, had he continued to own and hold said shares of classified common stock which he has delivered to the Company for conversion. * * *"

The contract contained a further provision, without any recital as to whether or not the benefits referred to therein were additional compensation to the taxpayer, as follows: "The Company further agrees with the Associate that when by reason of death, disability, or for any other reason, the Associate shall cease * * * to be the manager of such store, the Company will sell to him (or if he ceases to be manager by reason of death, then to his legal representatives or next of kin) at the then book value, and he or his legal representatives or next of kin shall have the right to purchase by paying such price, a sufficient number of shares of common stock of the Company, the earnings on which based upon the net earnings of the Company for the last full calendar year, will equal in amount two-thirds of the Associate's proportion * * * of the average annual net earnings of such store for three full calendar years * * *".

There is an additional provision that if the Board of Directors of the Company

deemed it necessary or advisable, by reason of structural corporate changes, reorganization, dissolution or sale of corporate assets, the Company could terminate the contract at the end of any calendar year upon paying to the taxpayer the amount due to him under the terms thereof and upon permitting him to exercise his right to purchase the stock which he is given a right to purchase therein.

In 1929 the Company terminated the contract, and the taxpayer exercised his right thereunder to purchase 971 shares of stock for $27,188, which represented the then book value of said shares. The fair market value of such stock was at that time $356,842.50.

In June, 1927, the Company announced a plan under which store managers who successfully operated their stores and met certain requirements would be given the opportunity to purchase so-called "expansion stock" (common stock) of the Company at a price per share to be determined each year by the Board of Directors. In order to qualify for the purchase of this expansion stock a manager had to comply with all of the following:

(1) Manage a store (with interest in its profits) for one calendar year;

(2) Make 7 per cent or more net profit on the volume;

(3) Have 8 per cent or more of the volume in cash, as of December 31.

To determine the number of shares a qualifying manager could purchase, the percentage of the store earnings to which he was entitled (in taxpayer's case one-third under his employment contract) was used as a basis. If the manager met the foregoing requirements he was given the right to purchase expansion shares to the extent of 50 percent of his percentage of store earnings. If he had trained a man who was used by the Company to open and manage a new store, he was given the right to purchase expansion shares to the extent of the remaining 50 percent of his percentage of store earnings.

In April, 1928, the Company advised the taxpayer that his management of the Modesto store had qualified him for the right to purchase expansion stock, and that he was eligible to participate to the extent of 100 per cent of his 1927 earnings. Taxpayer's percentage of the store's earnings for 1927 having amounted to $18,689, he was allotted 187 shares of stock at a price of $100 per share, the price of the stock determined by the Board of Directors. Taxpayer exercised his right to purchase, and bought these 187 shares at $100 per share. The fair market value of the shares at the time of purchase was $325 per share.

In March, 1929, the Company advised the taxpayer that he had qualified for the purchase of further expansion stock based on his operations for the year 1928. Taxpayer was allotted 88 shares, which he purchased for $120 per share, the price fixed by the Directors. The fair market value of the shares at the time was $350.50 per share.

Taxpayer filed his income tax returns for the years 1928 and 1929 on March 15, 1929 and March 15, 1930, respectively. No waivers of the statute of limitation with respect to either of said years have been filed by the taxpayer. He did not include as income the differential between the respective prices paid for the shares of stock referred to above and their fair market value at the respective dates of acquisition, because he did not understand that the differential constituted taxable income to him in those years. No additional assessments were made by the Commissioner for those years, and the statute of limitations has now barred any additional assessments.

In 1930 and 1931 the taxpayer sold certain shares of stock of the J. C. Penney Company which he had acquired in 1928 and 1929 in the manner above described, and in reporting his profit on the sale thereof used as his cost basis the fair market value at the time of acquisition. The Commissioner determined deficiencies, using as the cost basis the actual cash outlay of the taxpayer in the acquisition of the shares.

The Board of Tax Appeals affirmed the Commissioner's determination, and the present appeal followed.

The Board found, with respect to the acquisition of said stock by the taxpayer, that "the excess of the fair market value over the agreed price was not compensation paid for services in the year when the shares were acquired".

The Commissioner argues that even assuming that the finding of the Board to the effect that the differential did not represent additional compensation is in error, still the taxpayer is not entitled to use the fair market value at the time of acquisition as his cost basis in determining the profit arising from the subsequent sale. The tax

payer in claiming the right to use the fair market value as his cost basis relies upon Art. 51 Treasury Regulation 74 promulgated under the Act in question, which reads as follows:

"Art. 51 *What included in gross income.* * * * Where property is sold by * * * an employer to an employee, for an amount substantially less than its fair market value, such * * * employee shall include in gross income the difference between the amount paid for the property and the amount of its fair market value. In computing the gain or loss from the subsequent sale of such property its cost shall be deemed to be its fair market value at the date of acquisition by the * * * employee. * * "

The argument of the Commissioner is that the last quoted sentence of said Article applies only in cases where the taxpayer has reported and paid a tax on the differential at the time he received the same.

If in fact a taxpayer paid a portion of the purchase price of the stock with his own services, we do not agree to the conclusion of the Commissioner. The treasury regulation is merely a recognition of the principle that a broad rather than restricted meaning must be given the word "cost", and a taxpayer should not be deprived of its provisions merely because he was not taxed during the year of acquisition.

The above discussion, of course, assumes that there is no basis for working out an estoppel against the taxpayer. The Commissioner contends that in the instant case the taxpayer is estopped from now asserting that the differential constituted income during the years of acquisition, because of his failure to report the same as income for those years.

■ We do not agree that the facts give rise to an estoppel. It is clear from the evidence that petitioner made a full disclosure of the transactions to the deputy collector, who assisted in preparing the taxpayer's returns. He showed the deputy all letters, contracts and other communications that he had received from the Company concerning the purchases of stock. If in fact the additional income was required to be reported in the years that the stock was acquired, the failure to report it was caused by a mistake of law in which both parties participated, and not because of any intent on the part of the taxpayer to mislead. See Helvering v. Salvage, 297 U. S. 106, 109, 56 S.Ct. 375, 80 L.Ed. 511.

Taxpayer, on the other hand, suggests that regardless of the nature of the transaction, it falls within Art. 51, Treasury Regulations 74 quoted above, providing that where property is sold by an employer to an employee, for an amount substantially less than its fair market value, the difference in value is income to the employee. It is argued from here that since the differential was income during the year in which the stock was sold to the taxpayer, it was proper for him to use the fair market value at the time of acquisition as his cost basis in determining his profit on the subsequent sale.

■ Nor do we agree to this suggestion. Departmental regulations may not invade the field of legislation, but must be confined within the limits of congressional enactment. Commissioner v. Van Vorst, 9 Cir., 1932, 59 F.2d 677, 679, and cases cited therein.

If the regulations go beyond what Congress can authorize or beyond what it has authorized, they are void and may be disregarded. Utah Power & Light Co. v. United States, 243 U.S. 389, 410, 37 S.Ct. 387, 61 L.Ed. 791.

The Sixteenth Amendment to the United States Constitution, U.S.C.A., empowers Congress to levy a tax on "income". "Income" is defined in Eisner v. Macomber, 252 U.S. 189, 207, 40 S.Ct. 189, 193, 64 L. Ed. 521, 9 A.L.R. 1570, as follows: " 'the gain derived from capital, from labor, or from both combined,' provided it be understood to include profit gained through a sale or conversion of capital assets."

Under the above definition of income, it is clear that there can be no objection to the Regulation referred to if it is confined to a situation where the right to purchase stock at less than market value is in fact additional compensation to the employee, for in such situation there is not a bona fide purchase and sale, and the court will look through the form and to the substance of the transaction.

But, what about a situation where there is a bona fide sale at less than market value from an employer to his employee, which cannot under the facts be said to be additional compensation? How can it be said in such situation that the employee has received any "income" as defined above? By our premise for the purpose of discussion

that the differential did not constitute additional compensation we have eliminated the possibility of its being considered "gain derived from labor", and of course there is no basis for holding it a gain derived from capital, or a profit gained through a sale or conversion of capital assets.

■ The conclusion is inescapable that where there is a bona fide sale from an employer to an employee, at less than market value, or where there is a gift from the employer to the employee, the Treasury Regulation above referred to cannot transform such purchase or gift into taxable income on the part of the purchaser or donee.

This is in accord with the reasoning of this court in Commissioner v. Van Vorst, supra, where the taxpayer purchased certain real property from a corporation of which he was the principal stockholder, at less than its market value. It was contended by the Commissioner that the difference in value constituted income to the stockholder, under Treasury Regulations then in effect providing that where a sale is made from a corporation to a shareholder for an amount substantially less than its fair market value, such shareholder shall include in his gross income the difference between the amount paid and the fair market value of such property. In answer to that contention we said, 59 F.2d at page 681: "The contention that a transaction which is in form a sale may, nevertheless, constitute a distribution to a stockholder of corporate assets or earnings may be conceded. It does not follow, however, that every such sale should be regarded as a distribution." We held that the transaction involved was a bona fide sale, and therefore the difference in value was not taxable to the purchaser.

It is therefore necessary for us to examine into the question of whether or not the differential constituted additional compensation to the taxpayer.

■ The first point for consideration in this connection is the power of this Court to review the finding of the Board to the effect that it was not additional compensation. We think that this question is settled by the case of Bogardus v. Commissioner, 302 U.S. 34, 38, 39, 58 S.Ct. 61, 64, 82 L.Ed. 32, wherein the Supreme Court said, "The Board of Tax Appeals concluded that, from a careful consideration of all the evidence, 'the payments made by Unopco to the petitioners and others were additional compensation in consideration of services rendered to Universal and were not tax free-gifts.' This, as we recently have pointed out, is 'a conclusion of law or at least a determination of a mixed question of law and fact. It is to be distinguished from the findings of primary, evidentiary, or circumstantial facts. It is subject to judicial review and, on such review, the court may substitute its judgment for that of the board.' Helvering v. Tex-Penn. Oil Co., 300 U.S. 481, 491, 57 S.Ct. 569, 573, 574, 81 L.Ed. 755; Helvering v. Rankin, 295 U.S. 123, 131, 55 S.Ct. 732, 736, 79 L.Ed. 1343."

One of the evidentiary facts found by the Board, leading to the finding above quoted, is "The J. C. Penney Co. took the position that the difference between what their managers paid for the stock sold to them at so-called 'bargain prices' and the fair market value of the shares of stock on the dates of acquisition was not additional compensation and was not required to be included in the tax returns".

■■ There is no dispute over the finding that the J. C. Penney Company did not regard the differential as taxable income to the taxpayer. In fact, it did not take a deduction for the differential in its own income tax returns. But there is nothing in the record to support the finding that the Company took the position that the differential was not additional compensation. Furthermore, taxpayer argues that whether or not the differential constituted "additional compensation" does not depend upon the understanding of the parties, but "a determination of the motive impelling the act, based upon all of the attending facts and circumstances, or in other words, a determination of the substance of the transaction". We agree with the taxpayer that the interpretation that the parties place upon the transaction is not conclusive.

In Levey v. Helvering, Commissioner, C. App.D.C., 1933, 62 App.D.C. 354, 68 F.2d 401, the court had under consideration certain payments made by a corporation to its officers. The resolution of the Board of Directors authorizing the payments had recited that they were made as gifts, and everyone concerned treated the payments as gifts. The corporation in computing its own income tax did not claim the amounts as expenses or deductions. We quote from the opinion of the court, 68 F.2d at page 403:

"Petitioner, however * * *. insists that the payments in this case were gifts.

because when made the corporation owed no compensation to the officers who received them, and he says this follows from the fact that every one concerned treated them as gifts and there is no evidence of any fact negativing the expressed intention of the corporation in this regard.

"We are unable to agree that the result petitioner contends for follows. * * * it [the resolution authorizing the payment] was confined to officials of the corporation who had rendered services to the corporation for the year in question. If it was not made in recognition of services rendered, it was a misapplication of corporate funds, for obviously the corporation had no interest in giving away the corporate assets. * * * In most of the cases in which the question has arisen, the answer has been made to depend on the intention of the parties, and this usually and properly has been said to turn on the attending facts and circumstances. Ordinarily to ascertain the intention with which a thing is done, one looks to the motive impelling it. Here the motive is obvious. * * * Its amount was based on the value to the corporation of that particular officer's services to the corporation, for it was graduated on the salary schedule of the officers concerned. * * * A 'gift' is a voluntary transfer of property by one to another without consideration. [Citing cases.] Here there was consideration—indeed, a double consideration, viz., an acknowledgment and reward for services rendered in the preceding year, and a stimulus to continued effort and service in the ensuing year. Upon no other theory could the payments be justified, and it is not necessary nor proper to explore into an unknown field to find some other motive."

Since the taxpayer purchased stocks under two different plans, involving different legal principles, we shall discuss said purchases separately.

We first take up the so-called "expansion stock" which the taxpayer purchased under the plan announced by the Company in June, 1927. Under this plan the amount of this stock which each store manager was entitled to purchase depended upon the volume of business done by him in the preceding year, and whether or not he had trained a man during that preceding year who was used by the company to manage a store. Was it not a service to train a man in the business to the point that he could manage a business? If taxpayer here desired to perform this service for his employer was not the valuable thing the plan provided should go to him therefor clearly "compensation"? It seems to us that there could be no clearer example of a plan to reward employees for outstanding service, and we hold that the differential as to this stock constituted additional compensation.

We turn now to the 971 shares of stock which the taxpayer purchased in 1929 pursuant to the contract of April 25, 1927.

It should not be overlooked that under the terms of this latter contract the Company was bound to sell the stock to the taxpayer at its book value at the time of the purchase, upon the happening of certain contingencies. No testimony has been introduced as to the market value of the stock at the time the contract was entered into. The situation is analogous to that under discussion in the case of Omaha National Bank v. Commissioner, 8 Cir., 1935, 75 F.2d 434. In the cited case the taxpayer had been an employee of a company for some twenty-nine years. He entered into a contract with the company for the purchase of certain of its stock. He had been accorded this right of purchase because he was a valued employee of the company and it wished to retain his services. By the terms of the contract he was to buy and the company was to sell him 500 shares of stock at $50 per share. The company was to credit upon the purchase price a sum equal to all dividends declared upon a like number of shares, and to deliver the stock to him when the credits equaled the purchase price, or whenever he paid the difference between the credits and the purchase price. The taxpayer reported as income the credits which he received from the company, but the Commissioner took the position that the taxpayer had received as additional compensation the fair market value of the stock, which at the time of its delivery to the taxpayer was worth considerably more than the contract price.

We quote from the opinion of the court, 75 F.2d at page 435:

"The Board was entirely justified in finding that whatever gain the taxpayer actually realized in 1928 from the contract with his employer was additional compensation for his services, but we are unable to avoid the conclusion that the realized gain was to be measured by what the employer credited the taxpayer with upon his stock purchase contract, and not by the market value of the stock delivered to him. The con-

**952**

tract, as has already been pointed out, was made in 1918. The value of the 500 shares contracted for was, as between the taxpayer and his employer, $50 a share. * *

"The Commissioner and the Board have treated the transaction here involved as one in which the company in 1928 delivered 150 shares of stock to the taxpayer as additional compensation for services. They have disregarded the contract. The additional compensation which the taxpayer received was what he contracted for in 1918 and was the amount credited to him by his employer and with which he paid for the 150 shares of the 500 shares which he agreed to purchase. The difference between the amount of the credit and the fair market price of the stock was not a taxable gain realized in the year 1928, since the stock was not sold by the taxpayer in that year."

In other words, in the Omaha case, supra, the delivery of the 150 shares of stock to the employee was in performance of a contract which had been entered into ten years before. The court looked to the situation as it existed at the time of the entry into the contract, and found that at that time the stock contracted to be sold was worth the stipulated purchase price. Therefore the increased value of the stock was held not to be a taxable gain.

So in the instant case, the delivery of the common stock to the taxpayer in 1929 was pursuant to the contract entered into two years before. The taxpayer has introduced no evidence as to the value of the stock at the time the contract was entered into. In the circumstances he cannot here contend that he at that time received the right to purchase stock at substantially less than its market value, to place himself within the provisions of Art. 51 of Treasury Regulations 74, supra.

The taxpayer has the burden of proving the Commissioner to be wrong [Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212] and therefore in the absence of proof to the contrary, we shall assume that the common stock at the time of the contract was of the value placed on it by the parties [book value]. In this situation the increase in value of the stock between the time of the execution of the contract and the time of the exercise of the option would not be additional compensation. See Palmer v. Commissioner, 302 U.S. 63, 58 S.Ct. 67, 82 L.Ed. 50.

In this turn of the case, it is unnecessary for us to decide whether the differential as to this stock would constitute additional compensation, had it been proved that there was a differential between the market value at the time of the execution of the contract and the contract price.

The findings of fact by the Board of Tax Appeals recite merely that in 1930 and 1931 the petitioner "sold certain shares of stock of the J. C. Penney Co. which he had acquired in 1928 and 1929 in the manner above described". No finding is made as to how many shares were sold, or out of which block of stock they originated. The cause is remanded to the Board to determine these factual issues, and for entry of judgment in accordance with this decision. As to the stock sold which constituted a portion of the stock purchased under the plan announced by the Company in June, 1927, the taxpayer is entitled to use as his cost basis in determining the profit from the sale thereof, the fair market value at the time of acquisition. As to the stock sold which constituted a portion of the stock purchased pursuant to the contract of April 25, 1927, the taxpayer's cost basis is the purchase price.

HANEY, Circuit Judge, (concurring and dissenting.)

I concur in the holding that appellee may not invoke an estoppel because appellant has not been shown to have had an intent, or to have made a representation, to mislead any officer of the government.

I am not in accord with the majority's theory of the case. The Board found that the differential received by petitioner was "not paid to the petitioner as compensation for services rendered". While ordinarily upon review we may substitute our judgment on that question for that of the Board (Bogardus v. Commissioner, 302 U.S. 34, 39, 58 S.Ct. 61, 82 L.Ed. 32), I think we may not do so here. In making the determination, the controlling factor "is the intention with which payment, however voluntary, has been made". Bogardus v. Commissioner, supra, 302 U.S. at page 45, 58 S.Ct. at page 61, 82 L.Ed. 32. While such test is stated in the dissenting opinion, I believe the majority agreed on that point. 302 U.S. at page 43, 58 S.Ct. at page 61, 82 L.Ed. 32. I think we should not now attempt to determine that intent, because there was introduced before the Board a number of letters between petitioner and

the company, and such letters are not contained in the record before us. It is possible that the intent is clearly shown therein. At any rate, I think it to be a dangerous practice to decide cases on only part of the evidence. I think we should order the Board to certify to us the remaining exhibits before decision of the case.[1]

If we accept the Board's finding, then the differential was a gift. Bogardus v. Commissioner, supra, 302 U.S. at pages 34, 39, 58 S.Ct. at page 61, 82 L.Ed. 32. Being a gift the basis on sale would "be the same as it would be in the hands of the donor". Revenue Act of 1928, § 113(a) (2), 26 U.S.C.A. § 113 note. If the stock received by petitioner was treasury stock, then the basis probably would be the cost thereof to the company. Taft v. Bowers, 278 U.S. 470, 49 S.Ct. 199, 73 L.Ed. 460, 64 A.L.R. 362. Compare: Helvering v. Reynolds Co., 306 U.S. 110, 59 S.Ct. 423, 83 L.Ed. 536. If such stock was an original issue, then it is difficult to see any "cost" to the company. Reason indicates that the basis used for computing the gift tax would be the basis. Such basis would be "the fair market value thereof at the date of the gift". Revenue Act of 1924, § 320, 43 Stat. 314; Regulations 67, Art. 7(3).

On the other hand, if we assume that the differential was compensation for services rendered, then the basis for determining the gain would be "the cost of" the stock. The "cost", respondent argues, is the amount paid. The word "cost" is defined as follows: "The amount or equivalent paid, or given, or charged, or engaged to be paid or given for anything bought or taken in barter or for services rendered * * *" Merriam's Webster's Dict. (2nd Ed.). Under this definition, the "cost" to petitioner was the amount of cash he paid and the value of the services rendered. Nothing in the act or the regulations promulgated thereunder indicate that the word "cost" was used in a restricted sense. On the contrary, Art. 51 of Regulations 74 shows that a broad, rather than a restricted meaning must be given the word. However, assuming without deciding that such regulation is not applicable here,[2] we are required to accord the word its usual significance, as expressed in the dictionary definition. Old Colony Co. v. Comm'r, 301 U.S. 379, 383, 57 S.Ct. 813, 81 L.Ed. 1169. It is difficult to see how a person who rendered services and was paid therefor in stock, could be taxed for the gain arising from subsequent sale, if the limited meaning was held to be the proper one.

The majority distinguish between the "contract" stock and the "expansion" stock, on the theory that the "cost" of the stock was its market value in 1927 when the contract was entered into. I see no basis for such a distinction. The stock was not income to petitioner in 1927 for he did not then receive it, he did not have a fixed and unconditional right to receive it. Spring City Co. v. Commissioner, 292 U.S. 182, 54 S.Ct. 644, 78 L.Ed. 1200. His right was contingent upon earnings, and could be exercised only when he ceased to be store manager, upon his death, or upon termination of the contract by the company.

[1] The question of intent is usually one of fact. See e. g. Helvering v. Nat. Grocery Co., 304 U.S. 282, 58 S.Ct. 932, 82 L.Ed. 1346; Commissioner v. Cecil B. De Mille Productions, 9 Cir., 90 F.2d 12. In the Bogardus case the disagreement was on the holding that the intent there was "a conclusion of law or at least a determination of a mixed question of law and fact." In view of the dissenting opinion in the Bogardus case, the "reconstruction in the membership of the Court" (Associate Justice Frankfurter in Graves v. New York Ex rel. O'Keefe, 306 U.S. 466, 487, 59 S.Ct. 595, 602, 83 L.Ed. 927, 120 A.L.R. 1466); and Helvering v. Nat. Grocery Co., 304 U.S. 282, 58 S.Ct. 932, 82 L.Ed. 1346, it may be that the rule announced in the Bogardus case, and questioned in the dissenting opinion, will be overruled. I think such possibility does not justify disregard of the Bogardus case until the possibility becomes a fact.

[2] Larkin v. United States, 8 Cir., 78 F.2d 951, 954; Commissioner of Internal Revenue v. Farren, 10 Cir., 82 F.2d 141, 143.